IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AS 253 SANBORN STREET,  FRANKLIN, NH, DESCRIBED FULLY IN ATTACHMENT A, ONE GRAY TOYOTA COROLLA BEARING NH REGISTRATION 481 0759, AND THE PERSON OF ZACHARY COTE** | Case No. 20-_mj-189-01-AJ_____<br><br><br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT**

I, Tarah Rankins, a Special Agent with the Federal Bureau of Investigation

("FBI"), being duly sworn, depose and state as follows:

1.      I have been employed as an FBI Special Agent since 2015, and am currently

assigned to the Boston Field Office, Bedford Resident Agency.  I am a federal law enforcement

officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251 and 2252A, and

I am authorized by the Attorney General to request a search warrant. While employed by the

FBI, I have investigated federal criminal violations related to high technology or cyber-crime,

child exploitation, and child pornography.  I have received training in the area of child

pornography and child exploitation, and have had the opportunity to observe and review

numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media,

including computer media.

2.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises located at **253 Sanborn Street,**

**Franklin, New Hampshire** (hereafter "SUBJECT PREMISES"), further described in

Attachment A, including one residential dwelling, garage, one 2017 gray Toyota Corolla, bearing

NH 481 0759 registration, and the person of Zachary Cote, and any computer, computer media, and electronic media located therein, for the things described in Attachment B – specifically, evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2252(a)(4)(B), which relates to the illegal possession of child pornography, and Title 18 United States Code. Section 2252A(a)(2), which relates to the illegal distribution of child pornography.

3.      During the course of this investigation I have conferred with other investigators who have conducted numerous investigations and executed numerous search and arrest warrants which involved child exploitation and/or child pornography offenses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based in part on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and computer records related to this investigation, and information gained through my training and experience.

## STATUTORY AUTHORITY

4.      This investigation concerns alleged violations of 18 U.S.C. § 2252(a)(4)(B) and 18 U.S.C. § 2252A(a)(2), related to the possession and distribution of child pornography in the District of New Hampshire.  18 U.S.C. § 2252(a)(4)(B) makes it a crime for any person to knowingly possess one or more images depicting a minor under the age of 18 engaged in sexually explicit conduct.  18 U.S.C. § 2252A(a)(2) makes it a crime for any person to knowingly receive or distribute any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## **DEFINITIONS**

5.      "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

6.      "Child pornography" includes any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct where (A) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (B) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (C) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.  18 U.S.C. § 2256(8).

7.      "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

8.      "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, mobile "smart" telephones, tablets, and self-contained "laptop" or "notebook"

computers).

9.      "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.  A web server, for example, is a computer which hosts the data associated with a website.  That web server receives requests from a user and delivers information from the server to the user's computer via the Internet.  A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser.  Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

10.     "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

11.     "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

12.     "Computer-related documentation," as used herein, consists of written, recorded,

printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

13.      "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.   Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

14.      The "Internet" is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

15.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.   ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription.   ISPs typically charge a fee based

upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

16.      "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.  IP addresses are also used by computer servers, including web servers, to communicate with other computers.

17.      "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address.   URLs are made of letters, numbers, and other symbols in a standard form.  People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

18.      "Minor" means any person under the age of eighteen years.  See 18 U.S.C. § 2256(1).

19.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures,

photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

20.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.  See 18 U.S.C. § 2256(2).

21.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

## **PROBABLE CAUSE**

22.     LiveMe is a free application that can be downloaded on an Android or iOS mobile device permitting users to stream live video of themselves over the internet to an anonymous audience of fellow LiveMe users.  Those users can post comments and interact with people in the video i.e. give instructions or commands to the user.  This application also allows users to create groups where like-minded individuals can chat/text other users and post videos/images.  LiveMe creates a unique identifier, typically a string of numbers, for each individual user.  Each user has the ability to create a screen name which can be changed at any time.

23.     On November 18, 2019 and November 19, 2019, an FBI employee acting in an

undercover capacity (hereafter referred to as UC) was conducting an investigation on LiveMe in an attempt to identify users who were using the platform to exchange child pornography.  The UC identified an individual with the LiveMe profile identifier "48197317", using the screen name "Trey.Swizz," that was a member of several known child pornography groups within LiveMe, including one titled "anything goes."  "Trey.Swizz" posted an image to the "anything goes" group depicting a nude toddler age girl spreading her legs and exposing her anus and vagina.

24.   From this information the UC initiated a chat conversation with "Trey Swizz". The following are highlights of the conversation:

UC:     I'm a per dad with a yung dau, looking for like minded, no limits, hbu?

TREY.SWIZZ:  i don't have kids but im into that, can I see a picture of your daughter?

UC:     R u active with anyone yung? I have to be careful who I share pics with, I'm in Utah, how bout u?

TREY.SWIZZ:  no I have a sister but I don't live with her, im in new england

TREY.SWIZZ:  *[photograph sent depicting a prepubescent age girl exposing her anus and vagina area and inserting an object into her anus]*

TREY.SWIZZ:  *[photograph sent depicting a possible prepubescent age girl bent over exposing her anus and vagina area]*

TREY.SWIZZ:  *[photograph sent depicting a prepubescent age girl nude from the waist down, spreading her legs and exposing her vaginal area]*

TREY.SWIZZ:  just so you know im not a *[pig emoticon]* lol

UC:     Cool u r in the UK?

25.     On November 19, 2019, the FBI sent a subpoena to LiveMe requesting subscriber data for the account associated with user name "Trey.Swizz" and the user ID 48197317.  The response from LiveMe identified the account as being associated with the email address **zacharycote58@yahoo.com** and showed the registration device as being a Samsung SM-G935V cellular phone.  LiveMe provided that the IP address used to access the account most frequently and most recently was 146.168.6.121, which is owned by Atlantic Broadband.

26.     On November 22, 2019, the FBI sent a subpoena to Atlantic Broadband requesting subscriber information for IP address 146.168.6.121 for the date 11/18/2019.  Atlantic Broadband identified the subscriber as Colin Kozak, service and billing address of 15 A Street, Franklin, NH 03235-2513; telephone number 603-832-4398; email address dianemkozak@yahoo.com.

27.     On December 2, 2019, the FBI sent a subpoena to Yahoo! requesting subscriber information for the email address **zacharycote58@yahoo.com** used to register this LiveMe account.  Yahoo! provided the following subscriber information for the email address **zacharycote58@yahoo.com**:  Full Name: Zachary Cote; Alternate Email: **zachdaddy10@gmail.com**; Phone Number: **603-409-2477**.

28.     Through various database searches, Your Affiant identified one Zachary Cote ("SUBJECT"), Date of Birth August 26, 1997, living at 15 A Street, Franklin, NH 03235.  As of July 8, 2020, a New Hampshire driver's license issued to Zachary Cote and issued in 2018 listed his home address as 15 A Street, Franklin, NH 03235.  As of July 8, 2020, a red Nissan Versa vehicle, registration NH 4232669 was registered to Zachary Cote at 15 A Street, Franklin New Hampshire.

29.     On January 8, 2020 FBI surveillance observed Zachary Cote leaving the J Jill Group Distribution Center, 100 Birch Pond Drive, Tilton, New Hampshire and entering a red Nissan Versa.  COTE was then observed driving to 15 A Street, Franklin, New Hampshire.

30.     On June 4, 2020, FBI attempted to conduct surveillance of Cote at 15 A Street, Franklin, New Hampshire, but were unsuccessful.  Through additional investigation, agents learned that Cote was no longer residing at 15 A Street.  Consultation with local law enforcement in Franklin, New Hampshire, on June 11, 2020 revealed that Cote was possibly residing with his parents at 253 Sanborn Street, Franklin, New Hampshire.  Local law enforcement also advised that Cote was previously arrested for possession of child pornography in 2012, when he was still a minor and residing at his parents' home.  The disposition of this case is unknown, but COTE gave a full confession to law enforcement during that investigation wherein he admitted to possessing child pornography on his cell phone.  COTE advised he downloaded the child pornography on his home computer before transferring it to his cell phone.

31.     On June 16, 2020, FBI surveillance observed COTE's Nissan Versa parked in the driveway at 253 Sanborn Street, Franklin, New Hampshire.  On June 18, 2020 FBI surveillance again observed COTE's Nissan Versa parked in the driveway at 253 Sanborn Street, Franklin, New Hampshire.  On the same date, uniformed local law enforcement using a ruse made contact with a white male at the residence who identified himself as ZACHARY COTE.

32.     Your affiant determined that the phone number **603-409-2477** is a mobile telephone number that was serviced by Tracfone in November 2019.  Through my training and experience, I am aware that Tracfone is a provider of prepaid cellular communications services.  Because its services are prepaid, Tracfone does not require its subscribers to sign a contract or to provide a verifiable name, address, or email address.  Through a subpoena served on Tracfone in

June 2020, Your Affiant learned that the mobile number **603-409-2477** was activated on

September 26, 2019, and was deactivated on June 21, 2020.  There is no subscriber name or

address associated with the account, however the city and state listed in the account information

is Franklin, New Hampshire.

33.     Tracfone does not own or operate its own cellular networks in the United States;

rather, it operates on the cellular networks of other service providers—in this case, Verizon—for

a fee.  On August 7, 2020, the FBI served a search warrant to Verizon Wireless for records and

information associated with the cellular telephone assigned call number **(603) 409-2477**.  Based

on the records provided by Verizon, Your Affiant determined that the phone number **603-409-

2477** was temporarily off-network from June 19, 2020 through July 30, 2020, but was later

reactivated on July 31, 2020, using the same phone and SIM combination associated with the

Tracfone records described in Paragraph 32.

34.     Cell site location information provided by Verizon showed that prior to May 10,

2020, the phone assigned call number **603-409-2477** hit off of the cell tower/sector providing

service to 15 A Street most frequently, which is consistent with ZACHARY COTE's home

address at that time.  Cell site data further showed that upon being reactivated on July 31, 2020,

the phone has hit off of the cell tower/sector providing service to 253 Sanborn Street much more

frequently than any other tower/sector, which is consistent with the location that ZACHARY

COTE is currently residing.   Based on this information, there is probable cause to believe that

the cell phone that ZACHARY COTE was using at the time of the offense described herein can

now be found at 253 Sanborn Street.

35.     On October 20, 2020, FBI surveillance observed a 2017 gray Toyota Corolla,

bearing NH registration 481 0759, parked in the rear driveway of 253 Sanborn Street, Franklin,

NH.  Database checks revealed the NH 423 2669 registration for the Nissan Versa expired on

August 31, 2020.  The Toyota Corolla bearing NH 481 0759 is registered to Zachary Cote at 253

Sanborn Street, Franklin, NH.

## COMPUTERS, ELECTRONIC STORAGE
## AND FORENSIC ANALYSIS

36.    As described above and in Attachment B, this application seeks permission to

search and seize records that might be found on the SUBJECT PREMISES, in whatever form

they are found. One form in which the records might be found is data stored on a computer's

hard drive or other storage media. Thus, the warrant applied for would authorize the seizure and

search of electronic storage media or, potentially, the copying of electronically stored

information, all under Rule 41(e)(2)(B).

37.    I submit that if a computer or storage medium is found on the SUBJECT

PREMISES, there is probable cause to believe those records will be stored on that computer or

storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer

files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files

downloaded to a storage medium can be stored for years at little or no cost. Even when files have

been deleted, they can be recovered months or years later using forensic tools. This is so because

when a person "deletes" a file on a computer, the data contained in the file does not actually

disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free

space or slack space—that is, in space on the storage medium that is not currently being used by

an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

        c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

        d.      Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

        e.      Your Affiant is also aware, through training and experience, that digital storage devices have become interconnected, making it easy for even casual users of technology to transfer or copy images from one device to another, or to maintain duplicate copies on more than one device or storage medium.   In fact, many devices such as smartphones can be set to automatically back up their contents to alternate storage facilities, such as laptop or desktop computers, another phone, photo-sharing websites, and cloud storage providers.

        f.      Your Affiant is aware that the contents of smart phones can be synched with or backed up to other digital devices in a variety of ways.  Smartphones can be connected through cables to other devices, such as laptop computers, for data transfer.  Smartphones can also connect to other devices and transfer photos or documents wirelessly through technology such as Bluetooth.  Data can also be sent from the phone to an email account via the Internet, and subsequently downloaded from the Internet to a different device (such as a tablet, game system,

or computer) for storage. In addition, many smartphones utilize "cloud" storage.  Cellular telephones can be set to automatically back up their contents to user accounts hosted on servers of various cloud storage providers. Users can also opt to perform a back-up manually, on an as-needed basis. Your Affiant is aware that some smartphones also back up their contents automatically to devices such as laptop computers.  Additionally, cellular telephones can exchange data between two differing cellular communications devices and other types of electronic and media storage devices via Bluetooth or Wi-Fi, regardless of the type of operating system or platform being utilized to operate each of the electronic devices. In addition, media cards which contain many forms of data can be interchanged between multiple types of electronic devices, including but not limited to, different cellular telephones.

38.     As set forth above, probable cause exists to believe that an individual at the SUBJECT PREMISES has distributed, transported, received, or possessed child pornography. Based upon my knowledge and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals involved in such crimes:

a.     Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals often times use these materials for their own sexual arousal and gratification.

b.     Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs,

correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals often retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

         c.      Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

         d.      Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes also may correspond with and/or meet others to share information and materials; they rarely destroy correspondence from other child pornography distributors/collectors; they conceal such correspondence as they do their sexually explicit material; and they often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

    39.      As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES because:

         a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging

systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

      b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on

other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it and when, it is sometimes necessary to establish that a particular thing is <u>not</u> present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

40.     Based on my training and experience I know that much of the media referenced above, which may contain contraband, fruits and evidence of crime, is by its very nature portable.  This includes as example but is not limited to extremely compact storage devices such as thumb drives, laptop computers, and smart phones.  In my training and experience, I know it is not uncommon for individuals to keep such media in multiple locations within their premises, including in outbuildings and motor vehicles, and/or on their person.

41.     Searching storage media for the evidence described in the attachment may require a range of data analysis techniques. In most cases, a thorough search for information stored in storage media often requires agents to seize most or all electronic storage media and later review the media consistent with the warrant. In lieu of seizure, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     **The nature of evidence**. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

b.     **The volume of evidence**. Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files is evidence or instrumentalities of a crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.     **Technical requirements**. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not

be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

> d.   **Variety of forms of electronic media**. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

42.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the hardware, media, or peripherals on-site, the warrant I am applying for would permit officers either to seize or to image-copy those items that reasonably appear to contain some or all of the evidence described in the warrant, and then later review the seized items or image copies consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICES

43.   This warrant seeks authorization for law enforcement to compel ZACHARY COTE to unlock any DEVICES requiring biometric access subject to seizure pursuant to this warrant. Grounds for this request follow.

44.   I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These

biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

45.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

46.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front- facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

47.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light

toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

48.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

49.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the DEVICES subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

50.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the

device has remained inactive for four hours. Biometric features from other brands carry similar

restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped

with biometric features, the opportunity to unlock the device through a biometric feature may

exist for only a short time.

51.     In light of the foregoing, and with respect to (1) any device found on ZACHARY

COTE's person; (2) any device found in ZACHARY COTE's vehicle; (3) any device found in

SUBJECT PREMISES reasonably believed to be owned, used, or accessed by ZACHARY

COTE; law enforcement personnel seek authorization, during execution of this search warrant,

to: (1) press or swipe the fingers (including thumbs) of ZACHARY COTE to the fingerprint

scanner of the seized device(s); (2) hold the seized device(s) in front of the face of ZACHARY

COTE and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of

the face of ZACHARY COTE and activate the iris recognition feature, for the purpose of

attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

52.     The proposed warrant does not authorize law enforcement to compel that an

individual present at the SUBJECT PRESMISES state or otherwise provide the password or any

other means that may be used to unlock or access the DEVICES.   Moreover, the proposed

warrant does not authorize law enforcement to compel an individual present at the SUBJECT

PRESMISES to identify the specific biometric characteristics (including the unique finger(s) or

other physical features) that may be used to unlock or access the DEVICES.

## **CONCLUSION**

53.     Based on the aforementioned factual information, I respectfully submit that there

is probable cause to believe that evidence, fruits, and instrumentalities of the crime of possessing

child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) may be located at the residence at

**253 Sanborn Street, Franklin, NH** (hereafter "SUBJECT PREMISES").  I therefore seek a

warrant to search the SUBJECT PREMISES described in Attachment A and any computer and

electronic media located therein, and to seize the items described in Attachment B.

54.     I am aware that the recovery of data by a computer forensic analyst takes

significant time; much the way recovery of narcotics must later be forensically evaluated in a lab,

digital evidence will also undergo a similar process.  For this reason, the "return" inventory will

contain a list of only the tangible items recovered from the premises.  Unless otherwise ordered

by the Court, the return will not include evidence later examined by a forensic analyst.

/s/Tarah Rankins
 Tarah Rankins
Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.
Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: __Oct 26, 2020__

Time: __1:39 PM, Oct 26,__ **2020**

Andrea K. Johnstone
U.S. Magistrate Judge

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The premises to be searched include:

1. the residential property located at 253 Sanborn Street,  Franklin, New Hampshire, including associated outbuildings and garages (the SUBJECT PREMISES);

2. one 2017 gray Toyota Corolla, bearing NH registration 481 0759, registered to ZACHARY COTE; and

3. the person of ZACHARY COTE.

The SUBJECT PREMISES includes a stand-alone house, a garage adjacent to the house, and a shed behind the house.  The following photographs depict the SUBJECT PREMISES.  In the second photograph the house is on the left:



## ATTACHMENT B

## ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2252(a)(4)(B) and 2252A(a)(2):

1.      All records relating to violations of 18 U.S.C. §§ 2252(a)(4)(B), 2252A(a)(2) in any form wherever they may be stored or found at 253 Sanborn Street, Franklin, New Hampshire, including:

      a.      records and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256;

      b.      records or information pertaining to an interest in child pornography;

      c.      records or information pertaining to the possession, receipt, transportation, or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

      d.      records or information of and relating to visual depictions that have been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256, including the record or information used to create the visual depiction;

      e.      records or information pertaining to LiveMe;

      f.      photo-editing software and records or information relating to photo-editing software;

      g.      records or information relating to the occupancy or ownership of 253 Sanborn Street, Franklin, New Hampshire, including, but not limited to, utility and telephone bills, mail envelopes, vehicle registrations, tax bills, and other correspondence.

2.      Any computer or electronic media that were or may have been used as a means to commit the offenses described on the warrant, including the receipt, possession, distribution, or transportation of child pornography in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and 2252A(a)(2).

3. For any computer, computer hard drive, or other physical object upon which electronic data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f. evidence of the times the COMPUTER was used;

    g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    i. contextual information necessary to understand the evidence described in this attachment.

4. Records and things evidencing the use of the Internet, including:

    a. routers, modems, and network equipment used to connect computers to the Internet;

    b. records of Internet Protocol addresses used;

    c. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

5.      DEVICE UNLOCK:  During the execution of the search of the property, person, and vehicle described in Attachment A, and with respect to (1) any device on ZACHARY COTE's person; (2) any device in ZACHARY COTE's vehicle; (3) any device found in SUBJECT PREMISES reasonably believed to be owned, used, or accessed by ZACHARY COTE; law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of ZACHARY COTE to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of ZACHARY COTE and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of ZACHARY COTE and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

As used above, the term "COMPUTER" includes but is not limited to any and all computer equipment, including any electronic devices that are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.  These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, mobile "smart" telephones, tablets, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, thumb drives, flash drives, Micro SD cards, SD cards, CDs, DVDs, tape drives and tapes, optical storage devices, zip drives and zip disk media, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, fax machines, digital cameras, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, routers, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or

signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).